FILED

2006 Nov-15  AM 10:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TRACY CANTRELL, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 05-AR-1386-S |
| | } | |
| UTILITY METER SERVICES, INC., | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

Before the court is the motion of defendant, Utility Meter Services, Inc. ("UMS"), for summary judgment on the action brought by plaintiff, Tracy Cantrell ("Ms. Cantrell") under the Equal Pay Act, under Title VII for gender discrimination, and under Title VII for retaliation. Also before the court is the motion of UMS to strike the affidavit of Ms. Cantrell, which she offers in opposition to UMS's summary judgment motion. For the reasons that follow, the court will deny UMS's motion for summary judgment, and will deny its motion to strike as moot.

*Summary Judgment Facts*

This dispute relates to Ms. Cantrell's employment by UMS, and to the termination of that employment. UMS is in the business of providing service to the electric utility industry by recording readings from meters used to establish consumption of electricity. Ms. Cantrell was hired by UMS as a meter reader in May 1999. She earned $8.25 per hour when she first started work, and she thereafter received a number of raises until June 2001, when she

began earning $13 per hour, the then-established maximum hourly rate for meter readers.

Although she worked at various job sites while employed with UMS, Ms. Cantrell spent most of her time working in the rural area of Leeds, Alabama.  She claims that sometime in 2001, while she was working in Leeds, she was informed by her then-supervisor, Greg Willingham, that she was a "lead meter reader."  UMS denies that Ms. Cantrell was ever promoted to the position of lead, but it does not dispute that Ms. Cantrell was given responsibility for supervising three employees.  Individuals who were undisputably serving as "lead" meter readers during this time were male employees Rickie Gurley, who worked in Birmingham and supervised approximately 18-20 employees, and Bobby Taylor, who worked in West Jefferson County and supervised approximately 15 employees.  UMS contends that in addition to supervising significantly more employees than did Ms. Cantrell, Gurley and Taylor held additional responsibilities that Ms. Cantrell did not – namely, that they were responsible for loading electronic information on handheld machines called ITRONS each day.  Ms. Cantrell admits that she did not perform this task, but she claims that she repeatedly asked to receive the training required to do so and was not given that training.

On April 30, 2004, Ms. Cantrell filed an EEOC charge in which she alleged that UMS discriminated against her based on her sex.

2

In this charge, Ms. Cantrell claimed, *inter alia*, that she had not received the "current-diversion bonuses" to which she says she was entitled, whereas male employees had received these bonuses.  UMS awards a current-diversion bonus when a meter reader discovers that a customer has been diverting power from a meter – *i.e.*, when the customer has been stealing electricity.  Second, Ms. Cantrell claimed to the EEOC that she had not received the same opportunities for overtime as did her male counterparts.  She charged that she clocked-in early one day in order to accomplish some tasks before her scheduled workday was to begin, and was subsequently told by her then-supervisor, Russell Chandler, that she was not permitted to clock-in until her scheduled time.  Ms. Cantrell says that male employees Gurley and Taylor were allowed to start their paid workdays before they were scheduled to begin, and that Chandler said that the reason they were so permitted was that they, unlike her, were "lead men" – although, as stated, Ms. Cantrell says that she, too, held this position.  She points to no job description giving her the title "lead."  Third, Ms. Cantrell claimed in her EEOC charge that "about a year or so" before she filed it, Gurley and "the other men in the office" received raises above the $13 per hour she was earning, and that UMS subsequently took these raises back, but that she did not receive this raise. UMS contends that this intermittent raise – which was given to both male **and** female employees who worked in the Birmingham area – was

3

given in August **2000** and was taken away in October of the same year.  Ms. Cantrell does not dispute UMS's account of the timing and extent of this intermittent raise.

UMS fired Ms. Cantrell on January 24, 2005, citing as its reason that Ms. Cantrell had violated UMS's preventable-incident policy.  Under this policy, which UMS implemented in March 2003, UMS has the right to terminate any employee who incurs two "preventable safety incidents" – *i.e.*, when an employee's failure to follow UMS safety rules results in property damage or personal injury.  Ms. Cantrell's first "preventable incident" took place in August 2003, when she ran her company truck into a pole while she was not looking.  She does not deny that this accident was her fault and therefore that she was subject to being discharged if another preventable incident occurred.  Ms. Cantrell's second allegedly "preventable incident" occurred on January 21, 2005, when she was bitten by a customer's dog while she was reading the customer's meter.  Before March 2003, UMS safety rules permitted an employee to allow a customer with sufficient strength to hold his dog while the employee read his meter.  In March 2003, UMS changed its safety rules to require a meter reader to have the customer secure his dog in a room while the meter is being read.  Ms. Cantrell admits that she was bitten by a customer's dog and that the dog was not secured in a room while she was reading the meter, but she claims that she asked the customer to secure his dog and

4

the customer refused.  Ms. Cantrell says that the customer said he could hold the dog, but he lost control of the dog and it bit her.

Ms. Cantrell filed this lawsuit on June 26, 2005, alleging that UMS paid her discriminatory wages in violation of the Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. § 206(d)(1), *et seq.* ("EPA"), and that UMS violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.*, by discriminating against her in terms and conditions of employment on the basis of sex and by retaliating against her for engaging in statutorily protected activity.  UMS moves for summary judgment on each of Ms. Cantrell's claims.

### *Summary Judgment Standard*

In considering UMS's motion, the court must construe the evidence and make factual inferences in the light most favorable to the Ms. Cantrell, the nonmoving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  The court may enter summary judgment only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986) (citations omitted).  This determination involves applying

5

substantive law to the substantive facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed.  *See id.* at 248; *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

*Analysis*

## I. Equal Pay Act

Ms. Cantrell claims that UMS violated the EPA by paying higher wages to male employees who performed work equal to hers.  In order to establish a *prima facie* case under the EPA, Ms. Cantrell must prove that UMS "pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brenan*, 417 U.S. 188 (1974); *see Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 547 (11th Cir. 1991).  Ms. Cantrell can establish a *prima facie* case by comparing the jobs held by her and a male employee or employees, and showing that those jobs are "substantially equal" but involve unequal pay.  *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992).  If Ms. Cantrell did not perform "significant" duties in which other employees were engaged, their jobs were not "substantially equal." *Waters v. Turner, Wood, & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799-800 (11th Cir. 1989).

6

Violations of the EPA are subject to a two-year statute of limitations, or three-years for wilfull violations. 29 U.S.C. § 255(a). Ms. Cantrell filed this action on June 28, 2005. She has not alleged that UMS wilfully violated the EPA. Therefore, in order to prevail on her EPA claim, she must prove that she was paid less than a male who performed substantially equal work on or after June 27, 2003. If UMS can show that there are no genuine issues of material fact within this time frame, it is entitled to judgment as a matter of law.

The following facts alleged by Ms. Cantrell, if proven, potentially support causes of action under the EPA:

- Male employees received an intermittent pay raise to over $13 per hour in 2000, and Ms. Cantrell did not receive this raise. This intermittent raise took effect in August 2000 and was removed in October 2000.

- Keith Waters received a raise in which he was paid an hourly rate in excess Ms. Cantrell's pay rate for a brief period in 2001. At all other times, Waters's pay rate was equal to or less than that of Ms. Cantrell.

- Gurley received a forty-cent raise to $13.40 per hour in September 2003, while Ms. Cantrell's pay rate remained at $13 per hour.

- "Numerous" male employees received opportunities to perform overtime work, but Ms. Cantrell was denied these

opportunities.  As a result, Cantrell had a lower effective
pay rate than her male counterparts.

Neither the intermittent pay raise in 2000 nor Waters's raise in
2001, even if true, can be used to establish an EPA violation,
because this action was filed well after the expiration of the
limitations period with respect to these alleged events.  Indeed,
Ms. Cantrell conspicuously fails to dispute that the intermittent
pay raise she complained about in her EEOC charge took place in
2000, before her employment with UMS had even begun.  Moreover, the
fact that male employees received overtime opportunities while Ms.
Cantrell did not, even if assumed to be true, is insufficient to
establish that UMS violated the EPA.  *See Bielfelt v. Potter*, 2006
WL 561858, at *3 (N.D. Ohio March 6, 2006) (finding that "a claim
for equal overtime employment opportunities is outside the purview
of the Equal Pay Act" (quoting *True v. New York State Dep't of
Correctional Servs.*, 613 F. Supp. 27, 30-31 (W.D.N.Y. 1984)).

The fact that Gurley received a 40-cent per hour pay raise in
September 2003, while Ms. Cantrell did not, possibly establishes
that a non-time-barred EPA violation took place.  The parties do
not dispute that Gurley and Ms. Cantrell were paid different wages,
but UMS argues that this wage differential cannot establish an EPA
violation because Ms. Cantrell's job duties did not require the
same level of skill, effort, and responsibility as did those of
Gurley.  In particular, UMS points out that Ms. Cantrell did not

8

load ITRONS while Gurley spent up to two hours per day on this task, and that Gurley supervised 18-20 subordinates whereas Ms. Cantrell supervised only three employees.  Ms. Cantrell counters that she asked to receive ITRONS training but that her request was denied, and that, with the exception of loading ITRONS, she performed virtually every other duty Gurley performed.

Considering the evidence presently before it, the court is unable to rule as a matter of law that Ms. Cantrell cannot establish a *prima facie* case of an EPA violation.  Although there appears to be no dispute that Ms. Cantrell and Gurley did not perform **identical** jobs, there does exist sufficient evidence for a jury to find that they performed "substantially" equal work.  *See Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985) ("If reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment").  A jury is better equipped than this court to determine whether loading ITRONS is a "significant" duty, such that the jobs of Ms. Cantrell and Gurley were not "substantially" equal. *See Miranda*, 975 F.2d at 1534 (finding that when the underlying facts with respect to the parties' job duties are not disputed, but that the parties disagree as to the significance of these facts, the action was not amenable to summary judgment).

Once a plaintiff has established a *prima facie* case, the burden shifts to the defendant to show that any factor other than

sex provided the basis for the wage differential.  *Mitchell*, 936 F.2d at 547.  UMS contends that it is entitled to summary judgment even if Ms. Cantrell can establish a *prima facie* case, because Gurley "was performing work in addition to his Lead job and this was the basis for his higher pay."  UMS does not indicate exactly what additional work Gurley was performing, but it presumably refers to Gurley's job of loading ITRONS.  In any event, the court cannot find, based on UMS's conclusory statement, that on the undisputed facts UMS has met its burden of justifying the pay differential.  The same problem inheres in UMS's argument as in its argument that the two jobs were not "substantially similar."  The court believes that there remain genuine issues of material fact with regard to whether Ms. Cantrell has a *prima facie* case, and if so, whether UMS can establish one of the exceptions contained in 29 U.S.C. § 206(d)(1).  The court will accordingly deny UMS's motion for summary judgment, insofar as Ms. Cantrell proceeds with her claim that UMS violated the EPA by paying her a lower wage than it paid Gurley.  To the extent that Ms. Cantrell intends to use the intermittent pay raise given to certain employees in 2000, Waters's raise in 2001, or her being denied opportunities to work overtime hours, UMS's motion will be treated as if it were a motion in limine and accordingly granted.

**II. Title VII Discrimination**

Ms. Cantrell contends that UMS discriminated against her in violation of Title VII in terms of her pay, her opportunities for overtime work, her receipt of current-diversion bonuses, and her being fired.  Ms. Cantrell filed her first EEOC complaint on April 30, 2004, so that only acts of discrimination that took place after November 2, 2003 – 180 days before the date on which she filed her EEOC charge – are actionable.  *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *Ledbetter v. Goodyear Tire and Rubber Co., Inc.*, 421 F.3d 1169, 1180 (11th Cir. 2005), *cert granted*, 126 S.Ct. 2965 (U.S. June 26, 2006) No. 05-1074.

### A. Alleged Pay Discrimination

UMS argues that Ms. Cantrell cannot sustain her Title VII pay-discrimination claim, in light of the Eleventh Circuit's holding in *Ledbetter* that when an employee's pay level is subject to periodic reassessment through regularly scheduled raise decisions, that employee "may look no further into the past than the last affirmative decision directly affecting the employee's pay immediately preceding the start of the limitations period" when seeking to establish that his or her pay level was unlawfully depressed.  421 F.3d at 1183.  UMS claims that Ms. Cantrell's claims are untimely, since the start of the limitations period was November 2, 2003, whereas Ms. Cantrell reached the wage cap for meter readers at $13 per hour in 2001, Waters received a raise for

11

only a brief period which ended in 2001, and Gurley received his raise in September 2003.

The court respectfully disagrees with UMS. First, there is no evidence of which the court has been apprised which tends to show that Ms. Cantrell's pay was "subject to periodic reassessment through regularly scheduled raise decisions," so the court does not agree that this particular holding of *Ledbetter* applies. UMS contends that "the last decision with regard plaintiff's salary occurred in 2001," but it would be peculiar if Ms. Cantrell had received "regularly scheduled raise decisions" when no such decision was made between 2001 and her firing in January 2005. Second, even if the *Ledbetter* holding does apply, the court reads *Ledbetter* to permit it to look back to the last relevant decision **immediately preceding** the start of the limitations period. Therefore, the court would be permitted to look further into the past than November 2, 2003 for evidence of pay discrimination, but only as far back as the **last** decision **before** that date, so long as, and to the extent that, the alleged unlawful employment practice was still occurring as of November 2, 2003. Therefore, the court respectfully rejects UMS's argument that Ms. Cantrell's Title VII claim is untimely, insofar as Ms. Cantrell alleges that she was still receiving discriminatory pay on or after November 2, 2003.

Being satisfied that Ms. Cantrell's claim of pay discrimination is not for all purposes time-barred, the court must

analyze the claim under the *McDonnell-Douglas* burden shifting standard:

> Under the McDonnell Douglas/Burdine approach, a female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males.  Once a *prima facie* case is established, the defendant must articulate a legitimate, non-discriminatory reason for the pay disparity . . . . Once such a justification is advanced, the plaintiff must demonstrate by a preponderance of the evidence that the employer had a discriminatory intent.  In other words, the plaintiff must show that a discriminatory reason more likely than not motivated the employer to pay her less.

*Ledbetter*, 421 F.3d at 1185.  The court has already agreed with Ms. Cantrell's claim that she can establishe a *prima facie* case of sex discrimination if her job was substantially similar to that of Gurley, who was paid a higher wage.  UMS again counters that Gurley received a 40-cent per hour wage increase based on his "additional responsibilities," so that either the two employees' jobs were not "similar," or alternatively, that UMS had a legitimate, non-discriminatory reason for paying Ms. Cantrell less than it paid Gurley.[1]

While UMS may prove to be correct, it is the province of a jury to make that determination, for the same reasons it is the province of the jury to evaluate the equivalent inquiry with regard

---

[1] UMS also contends that Ms. Cantrell cannot prove that UMS violated Title VII due the disparity in pay between her and Waters, because Waters was working on a traveling crew when he received his 2001 raise and was therefore not similarly situated to Ms. Cantrell.  As Ms. Cantrell offers nothing in response, the court assumes she concedes UMS's contention.  In any event, there is no dispute that Waters never received a wage higher than that of Ms. Cantrell after November 2, 2003.  The court will accordingly grant UMS's motion insofar as Ms. Cantrell intends to prove pay discrimination because she did not receive the same raise as did Waters in 2001.

to Ms. Cantrell's EPA claim.  *See supra*, at 9.  The court cannot rule that, as a matter of law, the purported "additional responsibilities" of Gurley's job preclude Ms. Cantrell from establishing that her job was similar, or that such responsibilities amounted to a legitimate, non-discriminatory reason for the pay disparity.  A jury is the appropriate arbiter for that determination.  Therefore, to the extent Ms. Cantrell relies on the period of disparity in pay between her and Gurley for a Title VII violation, the court will deny UMS's motion for summary judgment as it did on her EPA claim.

### B. Alleged Discrimination With Respect to Overtime

Ms. Cantrell claims that UMS denied her opportunities to work overtime which were provided to male employees Gurley, Taylor, Waters, Rod Davis, Terry Adams, and Mike Newton; and that this amounts to discrimination in violation of Title VII.  Because overtime was assigned on a weekly basis, the court must evaluate each week of alleged overtime as a discrete act, and must limit Ms. Cantrell's claims to those weeks of alleged overtime discrimination starting on November 2, 2003, 180 days before she filed her EEOC charge.  Ms. Cantrell does not dispute that she was no longer discriminated against with respect to overtime beginning in June 2004, so her overtime claims are limited to alleged acts, and any resulting damages, that took place between November 2, 2003 and May

30, 2004.   Davis is not a proper comparator because it is undisputed that his employment with UMS ended in September 2003.

In order to establish a *prima facie* case with respect to her Title VII-overtime claim, Ms. Cantrell must be able to demonstrate that she occupied a job similar to that of higher-paid male co-employees.  *See Ledbetter*, 421 F.3d at 1185.  UMS contends that Ms. Cantrell cannot point to **any** male employees with whom she had a similar job with respect to overtime availability, because Taylor, Adams, Newton, Waters, and Gurley supervised larger teams than did Ms. Cantrell and/or worked in areas in which more overtime work was required.  UMS has submitted sworn declarations as evidence to support this assertion.

Although Ms. Cantrell offers two pages of argument in an effort to show that summary judgment would be inappropriate on this issue, the only attempt she makes to confront UMS's core argument is her bald assertion that "numerous similarly situated males who worked overtime hours far in excess of Ms. Cantrell . . . held jobs similar to hers."  Ms. Cantrell does not in any way address UMS's contention that the males to whom she refers worked in different areas, with different overtime requirements; or that the male employees had responsibilities different from hers.  The evidence is therefore undisputed that, with respect to her overtime claim, there were no similarly situated male employees.  The court will

accordingly grant UMS's summary judgment motion as it pertains to this allegation.

### C. Alleged Discrimination With Respect to Current-Diversion Bonuses

UMS argues that it is entitled to summary judgment on Ms. Cantrell's Title VII claim to the extent Ms. Cantrell claims that she did not receive current-diversion bonuses to which she was entitled. In support, UMS cites Ms. Cantrell's deposition testimony which UMS construes as an admission by Ms. Cantrell that she does not believe she was denied these bonuses on the basis of her sex. The court disagrees that the deposition testimony to which UMS refers necessarily supports this proposition, and accordingly declines to grant UMS's motion for summary judgment on this basis.

UMS also submits evidence showing that none of the UMS employees identified by Ms. Cantrell received current-diversion bonuses for any route read in Leeds after November 2, 2003. Therefore, argues UMS, Ms. Cantrell cannot sustain her current-diversion bonuses claim because she cannot point to any similarly situated male employees. In response, Ms. Cantrell goes no further than merely stating that "there is substantial evidence that she did not receive current-diversion bonus money that other similarly situated males did receive." This self-serving but unsupported statement, and the irrelevant deposition testimony which Ms. Cantrell cites to bolster it, are insufficient to create a triable

16

issue of material fact on this issue.  The court will therefore grant UMS's motion insofar as Ms. Cantrell alleges that UMS violated Title VII by failing to pay her current-diversion bonuses.

### D. Alleged Discrimination With Respect to Ms. Cantrell's Termination

Ms. Cantrell contends that UMS discriminated against her on the basis of sex in violation of Title VII when it terminated her. To establish a *prima facie* case of disparate treatment, Ms. Cantrell must show: (1) she is a member of a protected class; (2) she was subject to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job.  *See*, *e.g.*, *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).  District courts in the Eleventh Circuit "require that the quality and quantity of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Maniccia*, 171 F.3d at 1368).  UMS argues that there are no material facts in dispute with respect to the third element of Ms. Cantrell's *prima facie* case, and that it is therefore entitled to summary judgment.  In particular, UMS contends that Ms. Cantrell was terminated for having incurred two

preventable incidents, and that she can not identify any male employee who also had two such incidents after March 2003 and was not subsequently terminated.  Ms. Cantrell denies that the reason she was terminated was that she had two "preventable incidents." She cites the following deposition testimony of Bob Smith, a former supervisor of Ms. Cantrell:

> **Q:** [T]ell me in your own words why was Ms. Cantrell terminated?
>
> **A:** For having two preventable incidents
>
> **Q:** What do you mean by "preventable incidents"?
>
> **A:** That they were preventable.  They could have been avoided.
>
> **Q:** What do you mean by "incidents"?
>
> **A:** A dog bite and a vehicle wreck.
>
> **Q:** Okay.  Do you mean safety violations?
>
> **A:** Yes.

Ms. Cantrell identifies the following four male employees, whom she alleges incurred two or more "safety violations": Keith Waters, Terrance Adams, Mike Newton, and Chris Mosley.  In the case of Adams, Newton, and Mosley, one or more of the "safety violations" were instances in which the employees were bitten by dogs.

As a preliminary matter, the court notes that Smith's deposition testimony makes it clear, despite Ms. Cantrell's characterization of Smith's statements, that UMS's stated reason for terminating Ms. Cantrell's employment was **not** that Ms. Cantrell

18

had two "**safety violations**," but that she incurred two "**preventable incidents**."  Ms. Cantrell does not dispute that UMS's policy of two preventable incidents being grounds for termination took effect in March 2003, nor does she dispute that UMS's current dog-bite safety program – which requires a meter reader to have a customer to secure a dog in a room while the employee reads the customer's meter – also took effect in March 2003.  Moreover, Ms. Cantrell does not dispute that UMS considers a dog-bite incident to be "preventable" if it occurs when the UMS meter reader fails to follow the dog-bite safety policy, so that in order to constitute a "preventable incident" under UMS's March 2003 preventable-incident/termination policy, a dog bite must occur when a UMS employee fails to make sure that the customer actually secured his dog in a room.  The rationale for the rule seems obvious in light of what happened to Ms. Cantrell.

     In light of the foregoing, assuming that UMS's **stated** reason for firing Ms. Cantrell was its **actual** reason, Ms. Cantrell, in order to overcome UMS's motion for summary judgment, must show that there exist disputed facts material to whether or not any male employee sustained two **preventable incidents** after March 2003 and was not fired as a result.  Insofar as Ms. Cantrell characterizes an occurrence as a "safety violation" and/or a "dog bite," but does not dispute that such occurrence was not also a "preventable incident," that event does not prove that the misconduct for which

19

she was discharged was "nearly identical" to the conduct engaged in by a male employee who was retained.

Of the four male employees identified by Ms. Cantrell, only Adams had what Ms. Cantrell characterizes as any "preventable incidents." Ms. Cantrell contends that Waters, Newton, and Mosley each had at least two "safety violations" and/or dog bites (some of which took place **before** UMS's current policy regarding preventable incidents took effect in March 2003), but she does not dispute – or even address – UMS's contention that none of these latter three individuals had two or more **preventable incidents** on or after March 2003. Accordingly, taking UMS's stated reason for firing Ms. Cantrell as true, the only issues that could possibly amount to genuine issues of material fact and that could preclude this court from entering judgment in favor of UMS are those that pertain to Adams.

Ms. Cantrell alleges that the following occurrences in which Adams was involved constituted "preventable incidents":[2]

• Ms. Cantrell says that Adams was involved in a car accident in September 2003, and that the accident was listed on his disciplinary tracker as a preventable accident.

---

[2] Ms. Cantrell contends that, in addition to the alleged "preventable incidents" listed here, Adams had various "safety violations," including one incident in which Adams was bitten by a dog. Because Ms. Cantrell does not claim that these alleged "safety violations" were "preventable incidents" under UMS policy, the court need not address these occurrences in its analysis.

- Ms. Cantrell says that a motorist observed Adams weaving in and out of traffic at 90 mph in August 2004, and that this was considered a preventable incident by UMS.

- Ms. Cantrell says that Adams was involved in another motor accident on July 15, 2005, several weeks after Ms. Cantrell filed this action.  Adams was terminated after this last incident occurred.

UMS does not dispute that Adams's first and third occurrences constituted "preventable incidents" under its policy.  The second occurrence does not constitute a "preventable incident," however, because UMS defines "preventable incident" as one in which "an employee's failure to follow UMS safety rules results in property damage or personal injury," and Ms. Cantrell has no evidence that Adams's speeding and weaving in and out of traffic in August 2004 resulted in damage or injury.  Moreover, none of the evidence creates any possible inference that damage or injury occurred or that UMS considered the occurrence to be a "preventable incident." Despite Ms. Cantrell's attempt to characterize the August 2004 occurrence as a "preventable incident," the undisputed facts make it clear that when Adams had two "preventable incidents," UMS fired him.  Accordingly, Adams is not a proper comparator for purposes of Ms. Cantrell's claim.  This leaves Ms. Cantrell without a comparator.

Assuming that UMS's stated reason for firing Ms. Cantrell was its actual reason, Ms. Cantrell cannot sustain her Title VII claim on the basis of discriminatory termination because she cannot show that the misconduct for which she was discharged was "nearly identical" to that engaged in by any male employee whom UMS retained.  Entry of summary judgment with respect to this claim would therefore be appropriate, if the undisputed evidence necessarily demonstrates that UMS actually fired Ms. Cantrell because she had two "preventable incidents."

The court is not convinced, however, that the articulated reason was, *ipso facto*, the real reason.  It might be possible, for example, for a jury to find that UMS's stated reason for firing Ms. Cantrell was pretextual, considering the evidence that Ms. Cantrell attempted to follow UMS's dog-bite prevention policy during her second "preventable incident," but that when she did so, the customer refused to secure his dog, leaving her only option under a strict construction of the company rule to refuse to read the meter and possibly incur discipline; and the fact the termination came after her EEOC charge and was arguably an act of retaliation. UMS correctly points out that its policy need not address every imaginable contingency in order to define a "preventable incident," but it might seem to a jury an unduly draconian measure to fire an employee for violating a policy when the employee faced a dilemma and made a good-faith attempt to follow it.  Although a jury would

not be able to find that UMS violated Title VII merely because it disagrees with UMS's business judgment in establishing the rule or firing an employee for violating it, it could find Ms. Cantrell's attempt to follow company policy, if proven, to be circumstantial evidence that UMS's given reason for firing her was a pretext for illegal discrimination and/or a mask for retaliation. *See, e.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1051-52 (11th Cir. 2000) (finding that "just as 'there is more than one way to skin a cat,' there is also more than one way for a plaintiff to challenge a defendant's proffered nondiscriminatory reasons"); *see also Nix*, 738 F.2d at 1187 (explaining that an employer may fire an employee for any reason, so long as it is not for a discriminatory reason). The court will therefore deny UMS's motion for summary judgment, as it relates to Ms. Cantrell's discriminatory termination claim, in accordance with the foregoing.

## III. Title VII Retaliation

Finally, Ms. Cantrell says that UMS retaliated against her in violation of Title VII by firing her after she filed her EEOC complaint on April 30, 2004.  UMS moves for summary judgment on this claim, contending that there are no genuine issues of material fact.

In order for Ms. Cantrell to prevail on her retaliation claim, she must demonstrate (1) that she engaged in statutorily protected activity, (2) that she was subjected to an adverse employment

action, and (3) that the adverse action was causally related to her protected activity. *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). If she does, UMS must then articulate a legitimate, non-retaliatory reason for its actions, which Ms. Cantrell must demonstrate are pretextual in order to prevail. *Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).

There is evidence to make out the first two elements of Ms. Cantrell's *prima facie* case. Her filing of the EEOC complaint in April 2004 was a statutorily protected activity, and she was subjected to adverse employment action when UMS fired her in January 2005. UMS contends that Ms. Cantrell cannot establish her *prima facie* case because she cannot demonstrate that her being fired was causally related to the filing of her EEOC complaint. In particular, UMS says that the nearly nine-month time difference between Ms. Cantrell's filing of her EEOC complaint and her being fired precludes a showing of any causal connection. The court disagrees that this time lag makes it impossible for Ms. Cantrell to establish a *prima facie* case. In order to show that the third element has been met, Ms. Cantrell need only show that her filing the EEOC complaint and her being fired were not "wholly unrelated." *EEOC v. Reichhold Chem., Inc.*, 988 F.2d 1564, 1571 (11th Cir. 1993). Although courts have found time lags of less than nine months to be insufficient to create an inference of causal

24

connection, "temporal proximity is not dispositive on the causation issue because opportunities for retaliation do not always immediately present themselves." *Mandell v. County of Suffolk*, 316 F.3d 368, 384 (2d Cir. 2003).  This is particularly true when the circumstances provide a basis for arguing that the employer was "lying in wait," waiting for a colorable excuse to come along.  The court therefore finds that a genuine issue of material fact exists with regard to whether Ms. Cantrell can establish her *prima facie* case of retaliation.

UMS next argues that, even if Ms. Cantrell can establish her *prima facie* case, it is entitled to summary judgment because it has articulated a legitimate, non-retaliatory reason for Ms. Cantrell's termination – namely, that it fired Ms. Cantrell for having had two "preventable incidents."  Similar to the case with Ms. Cantrell's Title VII gender-based discharge claim, there exist genuine issues of material fact as to whether UMS's stated reason for firing Ms. Cantrell was a pretext for retaliation.  *See Sullivan*, 170 F.3d at 1059.  Therefore, the court will deny UMS's motion for summary judgment as it relates to Ms. Cantrell's Title VII-retaliation claim.

*Conclusion*

In accordance with the foregoing, UMS's motion for summary judgment will denied by separate order.  Because the issues raised in UMS's motion to strike Ms. Cantrell's affidavit will be mooted

25

by the parts of the court's ruling in which it will treat UMS's motion for summary judgment as a motion in limine, UMS's motion to strike will be denied.

DONE this 15th day of November, 2006.


_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE